Counsel of Record:
Elaine C. Greenberg
Denise D. Colliers
Mark R. Zehner
Mary P. Hansen
G. Jeffrey Boujoukos
Scott A. Thompson
Securities and Exchange Commission
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | Case No. |
| **Plaintiff** | : | |
| | : | **COMPLAINT FOR** |
| v. | : | **VIOLATIONS OF THE** |
| | : | **FEDERAL SECURITIES** |
| **GE FUNDING CAPITAL MARKET SERVICES, INC.,** | : | **LAWS** |
| | : | |
| **Defendant.** | : | |

Plaintiff, the United States Securities and Exchange Commission ("Commission"), 701 Market Street, Suite 2000, Philadelphia, Pennsylvania 19106, alleges as follows against defendant GE Funding Capital Market Services, Inc. ("GEFCMS"), whose principal place of business is 201 High Ridge Road, Stamford, Connecticut 06905.

### SUMMARY

1.  This case involves various fraudulent bidding practices by GEFCMS involving the temporary investment of proceeds from the sale of tax-exempt municipal securities in certain reinvestment instruments by state and local governmental entities in the United States ("Municipalities"). As described below, GEFCMS's fraudulent practices and misrepresentations affected the prices of certain reinvestment instruments, deprived the municipalities of a

conclusive presumption that their reinvestment instruments were purchased at fair market value, and/or jeopardized the tax-exempt status of certain underlying securities, thereby injuring numerous Municipalities. During a five-year period, GEFCMS fraudulently manipulated the bidding process in connection with at least 328 transactions concerning the reinvestment of proceeds from the sale of over $24.2 billion of underlying municipal securities, generating millions of dollars in ill-gotten gains.

2. From August 1999 through September 2004 (the "relevant time period"), GEFCMS engaged in fraudulent practices and made misrepresentations in connection with the bidding of certain municipal reinvestment instruments. In most of the tainted transactions, GEFCMS, through its municipal traders, placed bids, which constituted offers to provide the specific reinvestment products to the Municipalities. In this role, GEFCMS acted as a "Provider."

3. GEFCMS at times, (a) won bids because it obtained advance information concerning the competing Providers' bids, typically from the "Bidding Agent," who acted on behalf of the Municipalities and collected bids from Providers offering to provide the reinvestment products ("Last Looks"); (b) won bids set up in advance by the relevant Bidding Agent to enable GEFCMS to win because the Bidding Agent deliberately obtained off-market non-winning bids from other Providers ("Set-Ups"); and (c) facilitated Set-Ups by deliberately submitting purposely non-winning bids, including, but not limited to, "Courtesy Bids" (types of purposely non-winning bid submitted in order to satisfy particular tax regulations) to Bidding Agents.

4. As a result of the aforementioned misconduct, during the relevant time period, GEFCMS illicitly won bids for at least 203 municipal reinvestment instruments and submitted at

least 125 purposely non-winning bids. GEFCMS made material misrepresentations by, among other things, submitting false certifications to the effect that the aforementioned bids were the product of a bona fide solicitation, i.e., they were competitive and not tainted by undisclosed consultations, agreements, or payments and reflected fair market value for the purchase of the reinvestment instrument.

5. By engaging in the misconduct described herein, GEFCMS violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C § 77q(a).

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. §§ 77t(b)]. The Commission seeks a permanent injunction against GEFCMS, enjoining it from engaging in the acts, practices, transactions, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

7. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]. GEFCMS, in connection with the offer and sale of securities, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or the mails with respect to the acts, transactions, practices, or courses of business alleged herein.

8. Venue in this District is proper pursuant to 22(a) of the Securities Act [15 U.S.C. §77v(a), because GEFCMS transacts business in this judicial district. For example, as set forth below, in Transaction C, GEFCMS fraudulently manipulated the bidding process concerning an agreement to invest the municipal bond proceeds of a New Jersey issuer and made misrepresentations that were provided to the New Jersey entity.

3

## DEFENDANT

9. GEFCMS is a Delaware corporation with its principal place of business in New York, New York. GEFCMS was formerly known as FGIC Capital Marketing Services, Inc. and is a wholly-owned, indirect subsidiary of a public corporation, General Electric Company. After September 11, 2001, GEFCMS relocated its operations to Connecticut and returned them to New York in or about December 2001. In June, 2009, GEFCMS relocated its operations to Connecticut.

## RELATED PARTIES

10. GEFCMS, along with two other affiliated firms, issued guaranteed investment contracts ("GICs") during the relevant time period. The other two firms were Trinity Funding Company, LLC ("Trinity"), and Trinity Plus Funding Company, LLC ("Trinity Plus"). GEFCMS through its wholly-owned direct subsidiary, IC Funding Corp., controls Trinity and Trinity Plus, both of which are New York limited liability companies. All three firms issued uncollateralized GICs. In addition, Trinity Plus also issued collateralized GICs and repurchase agreements ("Repos"). Although none of the three firms issued forward purchase agreements ("FPAs"), they did submit purposefully non-winning bids for FPAs on certain occasions. For the purposes of this complaint, all three will be referred to collectively as GEFCMS.

## FACTS

A. **Background**

11. Municipalities from time to time publicly offer and sell tax-exempt bonds and notes to finance various capital projects such as schools, highways, and hospitals, or to refinance existing bonds or notes. In addition, municipalities issue tax-exempt securities for the benefit of third-party conduit borrowers, such as hospitals, colleges and universities, and certain industrial

corporations. When these municipal securities are sold, portions of the proceeds are often not spent immediately. Instead, the proceeds are temporarily invested pending their use for the original purpose of the securities offering. Such proceeds are typically invested in financial instruments tailored to meet municipalities' specific collateral and spend-down needs, such as GICs, Repos, and FPAs.

12. GICs, Repos, and FPAs constitute securities or contracts to buy, sell, or loan securities. The GICs, Repos, and FPAs at issue were bid in connection with the sale of the underlying municipal securities. These instruments are often sold by major financial institutions, including broker-dealers, commercial banks, investment banks, insurance companies, and financial services companies (collectively "Providers").

13. GICs are typically contracts providing for the repayment of principal and a fixed rate of interest on the amount invested for a specified period of time that permit the investing Municipality to withdraw funds as needed. GICs are generally uncollateralized and issued by special purpose entities that obtain "guarantees" in the form of insurance policies from highly rated insurance companies. Repos are contracts that provide for the purchase by Municipalities of U.S. government securities, under which the seller also agrees to buy back, or repurchase, those securities in accordance with the needs of the Municipality at specified prices on one or more future dates. FPAs similarly are contracts for the purchase by Municipalities of U.S. government securities, but instead of being repurchased by the seller, the underlying U.S. government securities mature on future dates in accordance with the needs of the Municipality.

14. In order to preserve the tax-exempt status of municipal securities under the relevant tax regulations [26 C.F.R. § 1.148-5(d)(6)], generally these investments must be purchased at fair market value. Typically, Municipalities establish fair market value through a

competitive bidding process as set forth in the tax regulations. Among other things, these detailed tax regulations require the Municipality issuing the municipal securities to make a bona fide solicitation for the purchase of investments. This requires, in part, that all prospective Providers bidding on certain types of investments must be given an equal opportunity to bid, that all prospective Providers bidding on an investment make detailed written representations concerning the bidding process, and that similar written certifications are provided by the winning Provider ("Provider Certificates"). A failure to comply with these bidding requirements for certain types of investments creates a rebuttable presumption that the investment was not purchased at fair market value. Conversely, for certain types of investments, compliance with these detailed bidding regulations creates a conclusive safe harbor for establishing the fair market value of the reinvestment instruments.

15.  In situations where the tax-exempt status of the underlying municipal securities was not at issue, Municipalities also at times use the competitive bidding process and require Providers to make similar representations and certifications of a fair process to ensure that the Municipalities receive the best prices for the instruments at issue and to avoid the appearance of affording any particular entity favored treatment.

**B.   The Fraudulent Conduct**

16.  From August 1999 through September 2004, GEFCMS engaged in fraudulent practices in connection with the bidding of investment instruments – including GICs, Repos, and FPAs. GEFCMS, among other things, submitted bids that it knew were set-up in advance for it to win; submitted bids with the aid of advance information from the Bidding Agents regarding the competing Providers' bids; and submitted purposely non-winning bids. GEFCMS's bids for the reinvestment instruments were submitted by its municipal traders. Many of GEFCMS's

municipal traders, including a Managing Director and Business Leader, knowingly participated in the fraudulent bidding for certain municipal reinvestment instruments.

17. GEFCMS fraudulently manipulated the bidding process with the assistance of at least thirty-nine different Bidding Agents for the reinvestment of the proceeds of municipal securities through a variety of mechanisms, including providing Last Looks.

18. Bidding Agents afforded GEFCMS Last Looks in order to allow GEFCMS:

    a. to formulate its original bid with the use of information concerning the prices, price levels, rates, conditions or other information related to the bids of competing Providers;

    b. to revise a losing bid upwards so that the GEFCMS would win the bid; and/or

    c. to lower a previously submitted winning bid to a level at which GEFCMS would win the bid with additional profit (which, those involved often described as "not leaving money on the table").

19. GEFCMS also fraudulently manipulated the bidding process by deliberately providing off-market, purposely non-winning bids, including Courtesy Bids, to certain Bidding Agents which resulted in other Providers winning the transactions. In addition, GEFCMS also fraudulently manipulated the bidding process in advance by agreeing with certain Bidding Agents to limit the pool of prospective bidders and by including less competitive firms in the pool of prospective bidders.

20. In exchange for this improper, preferential treatment, and in furtherance of the aforementioned misconduct, GEFCMS, among other things, made improper, undisclosed payments to certain bidding agents, in the form of swap fees that were inflated, relative to the

services performed, or were unearned. These payments were in exchange for the bidding agents' assistance in controlling and manipulating the competitive bidding process. In exchange for this preferential treatment, GEFCMS also provided purposely non-winning bids to allow other Providers to win bids in ostensibly competitive bidding processes.

21. GEFCMS falsely represented or certified in its bid submissions and its Provider's Certificates that, among other things: its bids were arms-length bids; GEFCMS had not consulted with any other potential Provider about its bids; its bids were determined without regard to any other formal or informal agreement that GEFCMS had with the Municipality or any other person (whether or not in connection with the bond issue); and/or that its bids were not submitted solely as a courtesy to the Municipality or any other person for purposes of satisfying the requirements that (a) the Municipality receive at least three bids from disinterested Providers that the Municipality solicited under a bona fide solicitation and (b) at least one of the three bids received was from a reasonably competitive Provider.

22. GEFCMS knew that these false representations and Provider's Certificates were forwarded to the Bidding Agents, who were the agents of the Municipalities, and often to the Municipalities themselves, by means or instruments of transportation or communication in interstate commerce, usually telephone calls and subsequent facsimile transmissions.

C.   **Representative Fraudulent Transactions**

23. GEFCMS engaged in improper bidding practices on at least 328 occasions during the relevant time period through Last Looks, Set-Ups, and the submission of purposely non-winning bids. With respect to the 203 rigged transactions won by GEFCMS, the vast majority involved last looks whereby GEFCMS either raised a losing bid to a winning bid or reduced its

8

winning bid to a lower amount so that it could make more profit on the transaction. The following examples illustrate the conduct described above.

**Transaction A**

24. Transaction A was a Set-up. In March 2002, Bidding Agent A, who had served as a co-senior underwriter on $94 million of municipal securities for a Rhode Island issuer, also served as the Bidding Agent for the temporary investment of the proceeds of those securities into four separate funds. One of the four funds being bid, a $50 million Note Account, also created an opportunity for GEFCMS to enter into an interest rate swap with Bidding Agent A. Bidding Agent A's representative and GEFCMS's municipal trader arranged in advance for GEFCMS to win the bid for the $50 million Note Account GIC at reduced levels and for Bidding Agent A to provide the corresponding swap with respect to that fund.

25. Four days before the bidding, the two aforementioned persons discussed which providers should be included or excluded from the bid list. Bidding Agent A's representative specifically asked GEFCMS's municipal trader, "who do you want to see in this thing; who don't you want to see?" Not surprisingly, GEFCMS's municipal trader selected noncompetitive providers. Toward the end of the conversation, they also confirmed their prior agreement that GEFCMS would also enter into a swap with Bidding Agent A to hedge the associated interest rate risk. In subsequent conversations, Bidding Agent A's representative and the GEFCMS municipal trader agreed that the pricing level of the swap would depend on how well GEFCMS did on both the bid for the $50 million Note Account GIC and another $70 million fund that Bidding Agent A was bidding out on that same day. In the words of the GEFCMS municipal trader, "the better level I could get the other one at, the more I could give."

26. During the morning of the bid, Bidding Agent A's representative inquired about how well GEFCMS had done on the $70,000,000 bid, to which the municipal trader responded "I thought it was going to be a little bit better on that one bigger piece, but not bad." Bidding Agent A's representative then inquired about GEFCMS's indications for the four funds. GEFCMS's municipal trader confirmed that his prior indications were still in the ballpark and suggested that the bidding agent "just call around and see what you get first?"

27. Immediately before the bid, Bidding Agent A's representative called the GEFCMS municipal trader to inquire about his best levels as of that moment. The municipal trader explained to the bidding agent that he would like, among other things, to win the Note Account GIC at 4.20%, but "[i]f you need me to move up a little I could do it." In response, the bidding agent asked "what's a little, like a nickel or a couple?" GEFCMS's municipal trader explained "[y]eah, like the more, you know, so that we can take care of the other thing [i.e. the swap]," which is to say that the more money GEFCMS made on the Note Account and the $70,000,000 GICs, the more money GEFCMS had to take care of Bidding Agent A in pricing the swap. Bidding Agent A's representative acknowledged "[y]eah, I got you."

28. Two minutes later at 11:45 a.m., Bidding Agent A's representative called the GEFCMS municipal trader to "confirm," among other things, that GEFCMS would bid 4.05% for the Note Account GIC, which is to say 15 basis points lower (or better as far as GEFCMS's profit is concerned) than the level at which the GEFCMS municipal trader had wanted to win. In other words, during this conversation, Bidding Agent A effectively allowed GEFCMS to reduce its winning bid.

29. Nine minutes after GEFCMS had been awarded the Note Account GIC at 4.05%, GEFCMS's municipal trader and another representative of Bidding Agent A, joked about how

well GEFCMS had done on the two transactions and discussed the price at which GEFCMS would acquire the interest rate swap on the Note Account GIC from Bidding Agent A. The bidding agent representative requested a level of 4.23% and the municipal trader immediately agreed. GEFCMS also agreed to pay a bidding agent fee of $75,000, which GEFCMS indicated would be reflected on its Provider's Certificate.

30. GEFCMS's investment agreement incorporated both the $50 million Note Account GIC and a second investment which was rebid a week later. The omnibus Provider Certificate disclosed the bidding agent fees that GEFCMS paid Bidding Agent A, which totaled $81,250. It did not disclose, however, that Bidding Agent A had earned an additional $140,000 in connection with the swap related to the Note Account GIC. In addition, GEFCMS falsely certified in the omnibus Provider Certificate that its bid "was determined without regard to any formal or informal arrangement with the Issuer or any other person (whether or not in connection with the Bonds)...."

**Transaction B**

31. Transaction B was a Last Look. On February 26, 2001, an advisor to a California issuer ("Bidding Agent B") sought bids for an uncollateralized investment agreement for the Project Funds related to $485,350,000 of bonds. The bid contained two options: Option #1 was for an initial investment amount of $140 million, while Option # 2 was for an initial investment amount of about $83 million. Bidding Agent B's representative helped GEFCMS to raise its losing bid to a winning bid.

32. After asking Bidding Agent B's representative if he had received any bids of 5% and receiving a negative response to that inquiry, the GEFCMS municipal trader submitted a bid of 4.97% for Option #1 and "493ish" for Option # 2. The GEFCMS municipal trader then asked

11

the bidding agent if his bid of 4.97% was competitive. Bidding Agent B's representative responded that he was still waiting for two bids. The GEFCMS municipal trader then asked the bidding agent if he had received a bid from a specific provider, one of GEFCMS's primary competitors, and the representative responded affirmatively. Bidding Agent B's representative then declared, "at five, I think it's your deal." GEFCMS's municipal trader immediately raised his bid to 5% for Option #1 and 4.95% on Option #2. Approximately 17 minutes later, the bidding agent called to confirm that GEFCMS's bid on Option # 2 was 4.95% -- the level at which GEFCMS was awarded the investment agreement for an initial deposit amount of $83,049,178.

33.     In the Provider Certificate, GEFCMS improperly certified that its "bid submitted in connection with the Agreement was determined without regard to any formal or informal arrangement with the Obligor or any other person…[; and that it] did not review other bids that were submitted for the bidding process in which it was awarded the opportunity to provide the agreement."

### Transaction C

34.     Transaction C was a Last Look. On September 23, 2003, Bidding Agent C bid a $79,985,000, one-year investment agreement for a New Jersey issuer and arranged for GEFCMS to win the bid by providing GEFCMS with information concerning other bids.

35.     At 11:57 on the morning of the bid, Bidding Agent C's representative telephoned the GEFCMS municipal trader, among other things, to help GEFCMS formulate its winning bid. Prior to this call, other prospective providers had submitted their bids to Bidding Agent C and Bidding Agent C passed this information along to GEFCMS:

> Bidding Agent C:     It looks like people aren't going all the way to final….

| | | |
|---|---|---|
| GEFCMS: | | So they're coming in around 130 or so? |
| Bidding Agent C: | | Yes, 130 with a tie breaker on the end of it. |
| GEFCMS: | | So If I came in with 131, that's ok? |
| Bidding Agent C: | | How about if we do…I was going to take the indication you gave me as a gross; take 1.362 and knock 5 off? |
| GEFCMS: | | OK, 1.312.  That's fine.  I can live with that…. |
| Bidding Agent C: | | Fax me the bid form. |
| GEFCMS: | | 1.312… I'll send it through. |

36. Approximately thirty minutes later, the Bidding Agent telephoned to confirm that GEFCMS had won the bid at 1.312 and that the cover bid was 1.302.

37. In its Provider Certificate, GEFCMS falsely certified, among other things, that "the bid submitted in connection with the [Investment Agreement, dated as of September 30, 2003,] was determined without any regard to any formal or informal arrangement with the Issuer or any other person…" and that GEFCMS "did not review other bids that were submitted for the bidding process in which it was awarded the opportunity to the Agreement."

**Transaction D**

38. Transaction D was a Last Look.  On May 28, 2004, Bidding Agent D sought bids for three funds in connection with the temporary investment of the proceeds of the $110,000,000 of electric revenue bonds issued by a California Municipality.  This bidding agent allowed GEFCMS to lower its winning bid for the $93 million construction fund GIC twice in a single conversation.

39. Shortly before 10:00 a.m. on the morning of the bid, GEFCMS's municipal trader advised Bidding Agent D's representative that because he would "really love to take" the

construction fund and that he was going to be "really aggressive" with his bid. Approximately 37 minutes later, the GEFCMS municipal trader advised the bidding agent that he was willing to go up to 33 ½ and immediately asked if that were "too aggressive." Bidding Agent D's representative responded "why don't you let me call you back?" At 11:04 a.m., when the bidding agent called back to obtain GEFCMS's bid, the municipal trader reiterated that he was willing to go up to 33 ½ and asked again if that were too aggressive. Bidding Agent D's representative responded "...Hold on, hold on, hold on...Um...A little bit." GEFCMS's municipal trader then asked if 30 ½ was ok. Bidding Agent D's representative advised him "a tiny bit more." Then GEFCMS municipal trader lowered his bid to 29 to which the Bidding Agent D's representative responded, "yeah, perfect." The GEFCMS municipal trader confirmed that the GEFCMS's bid was BMA plus 29. Thirty-five minutes later, the bidding agent awarded GEFCMS the bid at BMA plus 29 basis points; his cover was BMA plus 26 basis points.

40.     In the Provider Certificate, GEFCMS improperly certified that its "bid submitted in connection with the Agreement was determined without regard to any formal or informal arrangement with the Obligor or any other person...[; and that it] did not review other bids that were submitted for the bidding process in which it was awarded the opportunity to provide the agreement."

## CLAIM FOR RELIEF

### Violation of Section 17(a) of the Securities Act

41.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 40, as if the same were fully set forth herein.

42.     As alleged herein, GEFCMS, in the offer or sale of securities or agreements to sell securities, by the use of the means or instruments of transportation or communication in

interstate commerce or by the mails, directly or indirectly (a) employed devises, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

43.   GEFCMS, as described above, knowingly, recklessly, or negligently submitted false bidding documents and Provider Certificates to the effect that its bids were the product of a bona fide solicitation, i.e., they were competitive and not tainted by undisclosed consultations, agreements, or payments and reflected fair market value for the purchase of the reinvestment instrument.

44.   By reasons of the foregoing, GEFCMS violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining GEFCMS from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### II.

Ordering GEFCMS to disgorge illegal profits that it obtained as a result of the fraudulent conduct described in this Complaint, together with prejudgment interest thereon;

### III.

Imposing civil monetary penalties on GEFCMS pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)]; and

### IV.

Granting such equitable relief as may be appropriate or necessary.

Respectfully submitted,

BY: *Mary P. Hansen*
Mary P. Hansen
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
hansenm@sec.gov

Of Counsel:
    Elaine C. Greenberg
    Denise D. Colliers
    Mark R. Zehner
    G. Jeffrey Boujoukos
    Scott A. Thompson

## Certification

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

By: *Mary P. Hansen*
Mary P. Hansen
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106